[Civ. No. 4863. Second Appellate District, Division Two.—February 4, 1928.]

A. C. GRAY, Appellant, v. MAUDE SOUTHERNE, Administratrix, etc., et al., Respondents.

Sapiro, Levy & Hayes and Boyd Oliver for Appellant.

William Guthrie for Respondents.

THOMPSON, J.—On November 2, 1896, one R. E. Blackburn agreed by an instrument in writing to sell to Claude E. Southerne about fourteen acres of land known and described as lots 1 and 2 of block E, Blackburn's Addition to Ontario, for the total sum of $1,800, payable in installments. A part of this contract reads as follows: "And it is further agreed by the said party of the first part (Blackburn) that he will furnish with said land a supply of water under pressure for domestic purposes equal to thirty gallons for each acre daily, said water to be piped along the

street opposite said Lot ——, whence it shall be taken at the expense of said party of second part. And said party of the first part shall, upon the execution and delivery of said deed of said lots as aforesaid, also deed to said party of the second part the said supply of water in the quantity specified, or else such an interest in the corporation stock of a water company as shall represent said water supply, and also a *pro rata* interest in the pipe system and rights-of-way for the distribution of water on said Blackburn's Addition in the same proportion as said lots bear to the whole of the land in Blackburn's Addition, it being understood that the cost, if any, of maintaining said water system shall be borne by the several owners thereof in proportion as their respective interests bear to the whole.''

On April 22, 1897, Blackburn deeded to Southerne the land and in the deed covenanted as follows: ''The said R. E. Blackburn hereby covenants, he shall and will on full payment of the notes given by said party of the second part, for part purchase price of said land and secured by mortgage on said land, deed for use on said land a supply of water under pressure for domestic purposes equal to thirty gallons per acre daily, said water to be piped along said Lots number 1 and 2, Block E, whence it shall be taken at the expense of said party of the second part, and also deed a *pro rata* interest in the pipe system and rights of way for the distribution of water on said Blackburn's Addition to Ontario in the same proportion as said lots bear to the whole of the land of said Blackburn's Addition, it being understood that the cost (if any) of maintaining said pipe and water system and said water supply shall be borne by the several owners thereof as their respective interests bear to the whole.''

Southerne, at the time, executed the two notes here sued upon for the balance of the purchase price, one for $600 and the other for $630 to fall due in three and four years, respectively, secured by a mortgage upon the real property. Blackburn endeavored to drill a well which proved a failure. At no time did he furnish or deliver any water or have any water to furnish or to deed. Southerne and his family lived on the property for a short time during the year 1898, during which period by courtesy of the city of Ontario they received water from that source, but that city

being obliged to discontinue the service on account of their own shortage, the Southernes were compelled to move. Testimony was introduced that the land was worth, at the time of its sale, without water, somewhere between $10 and $20 per acre and that it would have cost in the cheapest form $1,000 to sink a well and install equipment for a domestic supply of water. Blackburn assigned the notes to plaintiff on November 9, 1898, Southerne died on March 20, 1899, and Maude Southerne, the purchaser's widow, was appointed administratrix of his estate as late as May 7, 1919. Complaint was filed for the foreclosure of the mortgage in July, 1922. The defendant Maude Southerne as administratrix answered, denying all of the allegations of the complaint and alleging as a further defense that Blackburn agreed to supply water for irrigation or domestic purposes; that he had wholly failed to supply or deed water therefor and that the consideration for the notes totally failed.

The court rendered its judgment denying foreclosure and ordering that the mortgage be canceled for the reasons that the consideration had totally failed and further that plaintiff had lost his right to foreclose by reason of laches. The plaintiff appeals from this judgment.

The appellant assigns as reasons for the reversal of the judgment that there was no laches; that there was no obligation on the part of plaintiff's assignor to deed a water supply until after payment in full of the notes, or considering the covenants of the contract to be still in force, that there has been neither a rescission nor claim for damages.

■ This last-mentioned argument we think misses the mark. We may look to the entire transaction of the parties to determine whether the promise to pay and the promise to deed rights to a water supply were concurrent. We need not be governed in our solution of the problem "by any technical rules, but by ascertaining, if possible, the intention of the parties." (*Ernst* v. *Cummings*, 55 Cal. 179–183.) The original agreement for the sale of the land not only required a grant of the water rights upon the execution and delivery of the deeds, which delivery was to be made upon completion of the payments, but also to furnish the water during the life of the contract, and in addition required Blackburn to cultivate the land and set it with deciduous fruit-trees during the planting season 1896–97. Further-

more, the testimony established that as dry land the real estate value was very small—somewhere between $140 and $280. Undoubtedly the parties originally intended that payment should be made by defendant upon the furnishing of the water. When we turn our attention to the deed we find that the covenant is very similar to the covenant in the contract except that it does not specifically provide that water be furnished prior to consummation of the contract, but it does provide that there shall be deeded "for use on said land a supply of water," etc., which was to be done "on full payment of the notes," whereas in the contract the parties used the expression "upon the execution and delivery of said deed of said lots . . . , also deed to said party of the second part the said supply of water" which in turn was to be "upon the completion of the terms of this contract." So far as the use of words is concerned the only difference is found in the words "on" and "upon." We, therefore, conclude that the parties did not intend to make a distinction and yet by no construction could it be said that the covenants were not dependent in the original contract. ▮ We are of the opinion that by a fair reading of the covenants of the deed and mortgage they were also concurrent, and especially so when read in the light cast upon them by the prior agreement and the surrounding conditions. Therefore, until there had been a tender of the water right on the part of Blackburn or his assignee there could be no foreclosure of the mortgage. (*Englander* v. *Rogers*, 41 Cal. 420; *Bohall* v. *Diller*, 41 Cal. 532; *Naftzger* v. *Gregg*, 99 Cal. 83 [37 Am. St. Rep. 23, 33 Pac. 757]; *Howard* v. *Higgins*, 137 Cal. 227 [69 Pac. 1060].)

▮ It now remains for us to consider whether the court was within its right in directing the cancellation of the mortgage. For nearly twenty-seven years no right to a supply of water was tendered nor was Blackburn ever able to tender a right thereto for the reason that he had none to tender. The defendant for that period of time was either under the necessity of securing a different source of supply or of going without the use of the property which latter he was finally forced to do. To say that no prejudice has been suffered by the defendant as a result of the delay is to argue in the face of all reason and understanding. To argue that there was no change of position is to shut

34

our eyes to the facts. Doubtless Southerne in his lifetime, and his widow since, would gladly have paid the amount of the notes upon receiving water rights pursuant to the covenant, and doubtless had come to the conclusion by reason of the fact that it was impossible to deliver the water rights, that this chapter had been closed and that they had no reason to concern themselves with the possibility of the appearance of a modern "Rip Van Winkle." Certainly there has been such a great delay, accompanied by such circumstances as to awake an abhorrence on the part of equity, in taking action—and plaintiff has voluntarily submitted himself to this branch of our judicial system in seeking to foreclose his mortgage. Under these circumstances the mortgage would constitute a cloud upon real property—a lien which would be unenforceable by reason of laches and the impossibility of tendering performance of a concurrent condition, but nevertheless a cloud. It was not only the right, but the duty, of the court under such circumstances to "wipe the slate clean" by ordering the removal of the cloud. (7 C. J. 1189; *Wiard* v. *Brown*, 59 Cal. 194.) ■ Or, as said in *Swan* v. *Talbot*, 152 Cal. 142–147 [7 L. R. A. (N. S.) 1066, 94 Pac. 238]: "It is, indeed, the duty of a court of equity, when all the parties to the controversy are before it, to adjust the rights of all and leave nothing open for further litigation."

For very apparent reasons it is unnecessary for us to discuss whether the evidence was sufficient to justify the court in finding that the value of the water rights was at the time of the purchase the sum of $1,230, although it is obvious that the difference between the value of the land and the purchase price would leave considerable value to be put upon the water rights.

Judgment affirmed.

Works, P. J., and Stephens, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 2, 1928.

All the Justices concurred.